Case number 21-5073. Gordon M. Price versus Merrick B. Garland in his official capacity as Attorney General of the United States of America et al. Mr. Busa for the appellants, Mr. Horne-Revere for the appellate. Mr. Busa, good morning. Please proceed. Good morning and may it please the court, Joe Busa on behalf of the government. The statute governing commercial filming on National Park Service lands serves important government interests and is fully consistent with the First Amendment. That statute imposes the same kind of permit and fee requirements that apply to all commercial activity on NPS land. Commercial activity of all stripes is tightly controlled on park land to ensure that our national park system serves its core statutory purpose of preserving nature and wildlife unimpaired for future generations. That is a risk-averse mandate and one that NPS takes very seriously. For commercial activity to be allowed in our parks, it must not risk harm to the park's core purpose as parks and must give... This is First Amendment protected commercial activity, right? This is a First Amendment case. The argument is that this commercial activity is protected by the First Amendment, so how the government deals with other non-First Amendment protected commercial activities doesn't really relate to this case, does it? So, first of all, we don't dispute that filming in general is an expressive activity, Your Honor, but it is important to recognize the broad suite of commercial regulations at issue here because it shows the government really is targeting commercial conduct. It is not written a specific set of regulations specifically targeting First Amendment protected activity. I don't think you need intent to prove a First Amendment case, do you? No, of course not, Your Honor, and we're not saying that. But I think the key point... Let me just ask you a straightforward question about this to be sure I understand it, okay? The location fee... There's two fees, right? A location fee and a cost recovery fee. Is that what you get your permit for? Is that the way that works? That's what you pay for the permit? Commercial filmmakers have to pay both the location fee and cost recovery fee, if any, in order to obtain a permit and be able to commercially film. Gotcha. Okay, I understand it. And under the statute and the regs, the location fee is independent of the... It's in addition to the cost recovery fee, right? Correct, Your Honor. Now, the cost recovery fee, it's through that that the Park Service recovers all the expenses for managing the filming, correct? Like guards, cleanup, whatever they have, right? That's correct. The location fee is on top of that, right? Yes, Your Honor. So why isn't it just a classic and unconstitutional fee on the exercise of a First Amendment right? I mean, why isn't it like Murdoch and these other cases? It's a fee for a First Amendment protected activity. The fee, the location fee has nothing to do with cost recovery. It's the cost recovery fee that does that. So why isn't that a simple tax on a First Amendment activity? Because it's a broad-based assessment on all sides. Suppose I don't agree with you about that. Suppose I don't agree with you that because this is commercial activity, it's covered by all of... It's no different from any of the other commercial regulations that control commercial activities. Suppose I think that this is different because it's First Amendment. Then isn't it a fee for the exercise of First Amendment? No, Your Honor. I think that's foreclosed by Leathers versus Medlock. Similarly, there was a broad-based assessment. There was a sales tax assessed on cable providers. The court recognized that was First Amendment activity. They were engaged in speech, but the court said there was no problem from assessing that tax on cable providers and, by the way, exempting newspapers because there was nothing in that broad general scheme regulating commercial activity that in any way was disparate as to anyone's content or ideas or ability to communicate any messages. The Supreme Court said many times in Minneapolis Star, Leathers versus Medlock, Arkansas Writers Project, that a broad-based tax like that is wholly constitutional. And this tax is no different than the taxes similarly assessed on all commercial activity of all stripes. Hot dog vendors, people selling communicative T-shirts, people seeking to install rights-of-way or telecommunications equipment, which, again, also might implicate First Amendment values. All of these things are just of one piece of a broad-based commercial regulation. And for that reason, we say there's no First Amendment problem with the tax. Second and apart from that, Your Honor. I'm sorry. And what's your reaction to Price's argument that this interim guidance that was issued after the district court's decision undermines the government's claim that this fee is necessary to protect government's interest in protecting the parks? That is the low-impact exemption. The interim guidance, Your Honor, is a second-best fallback position that we issued in order to comply with the overbroad injunction here. We do not— If we were to reverse the district court, you would revoke the interim guidance? I would want to consult with my agency partners before giving a definitive answer. I suspect that might be the case because we would have an obligation to continue enforcing the statute, as Congress wrote it, in order to provide the best protection for our national treasures. Yeah, that's a really good point. I was going to ask you about that. Okay. I understand your answer. That's fine. Thank you. But the key point about the guidance, Your Honor, is that it really is a second-best fallback position. And the statute at issue here, 109.05 in Title 54, really is part of a broader series of regulations, as the guidance itself shows. So 107.51a is the core general power of the Secretary to regulate the use and management of NPS lands. That is the source of authority to NPS property. It was the source of authority that NPS used before 2000 to require permits for commercial filming, and before 1946 to require location fees. And no one doubts that what happened in 2000 was not a standalone regulation of speech, but Congress supervising the Secretary's use of that authority and disagreeing with a certain discretionary decision not to collect location fees. It's not a standalone regulation of speech. It is Congress amending a specific application of a general power. Congress must have that authority to supervise and administrative agency's exercise of its discretion. And in doing so, I don't think anyone should conclude that Congress defangs its own power to do so by having written a statute that mentions filming specifically. The same effect could have been achieved by just writing a broad-based statute, as Congress already did in 107.51a. So, Counsel, in your briefs, you argued also that the government is acting as a proprietor here. And is that independent of or anterior to the point you're making now? I think it's independent, Your Honor. So, you know, Congress created the National Park System and directed NPS to maintain it in such a way as to maintain it unimpaired for all future generations. So, Congress has given us a directive about how we're supposed to manage these lands. And that's a risk-averse directive. We're entitled to guard against even small risks that can come from any commercial activity on the property. And that's a proprietary function. We're managing these parks in a certain way that has nothing to do with speech or anyone's ability to communicate publicly. And it's also important to recognize that what's happening here is not a use of government property as a forum to communicate on the forum. You know, Haig, Schneider, Perry, Cornelius, all of the canonical public forum cases talk about using the forum to communicate with other people on the forum. But that's not at all what's going on here. This case is really no different from if, you know, a film editing studio wanted to set up shop on the National Mall. No one would think that because the mall can be used for political demonstrations or any other type of gathering, that somehow, you know, the major film studio would gain a leg up in the First Amendment analysis. Quite the contrary. Let's think about how good the fit is here. The distinction between commercial and non-commercial filming. Now, all the visitors to the park, with few exceptions, have a video capability in their pocket. Sorry, my video keeps going out. I'm not sure why. So it's almost impossible, it seems to me, to know whether filming activity is ultimately going to be part of a commercial exhibition or whether it's simply people making films for themselves. So it seems that the fit is less obvious now. I don't think that's quite right, Your Honor. And that's because of how we've designed the regulations here. The regulations focus on the person engaging in the commercial filming activity intends to earn income from the market audience at the moment of filming. And so we've included that intent requirement specifically to avoid a post hoc trap where it just so happens that, look, you engage in the filming activity at the time in good faith, not thinking you're going to earn money, and then later on decide maybe you want to commercialize it. We're not going to go ahead and penalize you retroactively. That's a benefit to the filmer. But it's certainly true that anyone going on to NPS lands planning to make money from the film that they're making, knows in advance that that's what they're going to do and they need to obtain the permit. And just to highlight, I'm sorry, Your Honor, I didn't want to go off. So a person who comes to the park with her iPhone and she has a YouTube channel, I think that's what they use, where she makes money through commercials and she's filming to put this on her YouTube channel. And she's just standing there with her iPhone doing that. She has to get a permit, pay a location fee, right? That's correct, Your Honor. So how do you distinguish this case from Bordley? So in Bordley, Your Honor, the demonstrations in question could only take place in certain designated areas. They're by and large talking about parking lots next to visitor centers. And the people were merely engaging in speech. And this court said, look, if you have a small group of people just talking in a small designated area next to a visitor center, that's indistinguishable from a normal park visit. And so, you know, so you've gone that way. Here you just have one person with an iPhone. I mean, what's the possible governmental interest? There's no costs. There's no impact on the park. In fact, if you just take, you have two people, they're both standing there with their iPhones. They're both filming exactly the same thing. One's going to send the film to his mother, and the other is going to put it on their commercial YouTube channel. One needs a permit, and the other doesn't. That's correct, Your Honor. And so just a couple responses. First, NPS's statutory mandate is a very risk-averse mandate, right? The agency is entitled to guard against even small risks to the unimpaired future use of generations. And so what's the risk in the hypothetical I gave you? What's the risk? So it may be that in a specific case, there actually is ultimately no risk, but there's actually no way for the filmer to know that before they come to us and tell us what their activity is going to be. Doesn't the government have to be especially careful, because this is a First Amendment activity? And the government has been. This is a classically overbroad statute? What about the copycat risk? I would think in this day and time, every time somebody puts something on YouTube, a million people do the same thing with a slight variation. That's exactly right, Your Honor. And there is a concern that one influencer goes into one sensitive area during wildflower season, and then suddenly you have a stampede of similar people doing similar things. And moreover, these filmers can't be expected- That could happen if she sends it to her mother. The mother could send it to the whole family, and you could have a stampede of cousins looking at the wildflowers. That's possible, Your Honor, but the commercial motivation here is something to take into account. People motivated by the intent to earn money can be expected to put boundaries in ways that's not true for normal visitors. Moreover, NPS- I'm sorry, I don't mean to be interrupting anybody. Moreover, NPS is used to the activities of normal visitors, and they know where to position their resources to guard against the harms of the parks that can come from those visits. But a commercial filmer, we have no idea in general what they might be intending to do, and they have no idea whether their even small boots on the ground might have particular effects. As the Secretary noted in 2013 when promulgating the regulations at issue here, although small groups can be expected to have far smaller consequences, that's not zero, and we need to know whether there's any particular risks. You know, there's certain times and places that can have congestion where there's nesting issues or delicate wildlife or plants or flowers that the filmer would have no reason to know about, but we wouldn't. All we're saying with the permit requirement is, come tell us what you're going to do, and by the way, small groups- What you just said is equally true of the non-commercial filmer. They don't know what your constraints are, what they might be trampling on by accident. That doesn't make much of a distinction. It seems to me that once you have everybody armed with a camera, some with commercial intent and some not, that you're really deprived of- that the damage to the park rationale is vastly undercut, but it leaves standing your return on the government's investment argument, right? That they want to recover their costs, but one way to do that is to charge commercial users. That's exactly right, Your Honor. So one reason for the permit requirement in that circumstance would be so that the public can obtain a fair return for the private exploitation of public resources, but I do just want to just highlight that non-commercial filming is not- it doesn't go unregulated here. As we pointed out in our briefings, the other side does not dispute a personal filming, incidental to a normal visit, does not require a permit, but any sort of filming that could threaten park resources does require a permit. And so it actually is true that a personal visitor to a national park that engages in some kind of activity sort of outside of what you would expect from a normal park visit would actually have to obtain a permit if that filming could be expected in any way to risk harm to our national parks, in the exact same way as a commercial filmer can risk harm when they're pursuing their pursuit of income from the filming activity. All right, so we're running over time here, but I don't want to miss out on your response to the overbreadth argument that, I guess, really, we don't have the district court- well, I'll let you articulate it, was that the district court really didn't delve at all into the degree of overbreadth, if any, as an empirical matter. That's correct, Your Honor, and the district court had no basis for concluding that, you know, any hypothetical small group filming activity on a public forum- and here we're just talking about, you know, the National Mall, Lafayette Park, a handful of areas within the NPS system- that hypothetical small group commercial filming activities there are so substantial in relation to the vast swaths of NPS land on which everyone agrees we actually could apply these requirements lawfully. That's so substantial that the harsh medicine and last resort of facial overbreath doctrine is warranted. You know, the Supreme Court made clear in Williams that you can't resort to facial overbreath to invalidate an act of Congress on its face in all of its applications on the mere basis of a hypothetical, and that's what we have here, Your Honor. All right, if there are no more questions, we'll give you a couple minutes to reply. Mr. Korn Revere. Thank you. Thank you, Your Honors, and may it please the court, I represent Mr. Price, and let me start with the points that Judge Tatel was asking about at the outset, whether or not this really is similar to the other kinds of commercial restrictions that exist in national parks, and I think that is the incorrect premise from which the government's argument flows. The flawed premise is that this is material identical to other statutes and regulations that completely unlike things like cattle grazing, mining operations, permanent or semi-permanent occupations of federal land. Permits for commercial filming grant no right to occupy federal land. They simply allow people to do the same thing that other visitors to the park are free to do, and this is illustrated by the hypotheticals that Mr. Busey uses. He referred to one in his argument, but there are several in his reply brief, saying that this would be like setting up a sitcom writer's room on NPS property, or building a film editing operation, or operating a kiosk on the Yorktown National Battlefield. That's the opposite of what we're suggesting, and as a matter of fact, as we pointed out on page 26 of our brief, that in sharp contrast to the types of cases that the government cites, Mr. Price was not occupying federal land to engage in commercial transactions, such as selling blu-rays of Crawford Road from kiosks, or operating a drive-in theater at Yorktown National Battlefield. As I say, he was seeking access to federal land only to the same extent as non-commercial filmmakers and commercial film crews. There's simply no analog in the, to this broader suite of regulations to which Mr. Busey refers. There aren't amateur cattle grazers on federal land, or hobbyist hot dog vendors. The relevant distinction here is the semi-permanent or permanent occupation of federal land, and not commercial motive. As a consequence, Would you, would you, I'm sorry, go ahead. Well, I was just going to say, if there's a broader suite of regulations that applies, it's really the organizing statute 100-101 that the government, that the director of operations referred to in his memorandum on the interim rules, suggesting this is the regulation that governs use of the park generally, that protects the resources, rather than the commercial uses that Mr. Busey argues is the analog. The government says, at one point in its reply brief, that there are, quote, many circumstances that plaintiffs concede would present no constitutional difficulties. What are those? Well, that, that, that was a misstatement of our position. That was simply putting, I believe, language from Forsyth County versus nationalist movement, talking about how in overbreadth challenges, you're allowed to challenge rules or laws, where there are many applications that wouldn't present problems, but there are some that do. We haven't conceded that there are applications of this law written as it is, that present no difficulties. What we've argued is that the law is overly broad, and imposes on unconstitutional tax. Would you see any problem at all if any First Amendment problem if the government had simply applied the rules it has for the press to commercial film makers? Would that be okay? Well, yes, because it would be fine, because there's no, no permit requirement, and there's no fee. And as a matter of fact, I think this is conceded by the government, not in its argument today, but in the application and the adoption of the interim guidelines, when it suggests that there is no requirement and risk, risk averse or not, for low impact filming, where you have five people or less with handheld equipment and a tripod, which is described the situation that initiated this case. And in the discussion in memorandum adopting the interim rules, the government explains the reason for this. It says in recent years, NPS has seen an increase in low impact filming activities within park areas. These activities involve minimal equipment and crews, such as individuals or small groups that film using smartphones or other handheld devices, many cases with nothing more than a tripod for equipment. These types of productions are highly unlikely to need a permit, because potential for impacts to resources and the visitor experience is no greater than the potential for impacts from visitors engaged in casual filming. This is true whether or not the footage is used for commercial purposes, such as posting footage online for profit. The commercial motivation adds absolutely nothing to the government's interest. In First Amendment terms, the Supreme Court has made clear for decades, that having a commercial motivation does not diminish the level of First Amendment protection. And in terms of whether or not having a commercial motive affects the government's interest here, it is ironic that the government itself posts photo contests, as the brief for the Amici National Press Photographer Association pointed out at page nine of its brief, that it hosts annually a share the experience photo contest. I visited the website for that contest over the weekend and discovered to my surprise, that they offer a $10,000 first prize for winning that contest. So if commercial motivation is what undermines the government's asserted interest, it is ironic indeed, that the National Park Service would sponsor a contest seeking to attract people to the park. The commercial distinction established in current law... You haven't addressed the government's argument based on simple return on their investment, if in commercial activity, which strikes me as being quite independent of any damage claims. The argument based on damage, as I said to a friend on the other side, is very much weakened, I think, by what you just read, for one thing. But that leaves standing this question of whether they can't just charge for use of their property and try to recover from those who are exploiting it for commercial gain. Right. I mean, I think the interim guidelines do take out the government's position entirely on the issue of the permit requirement, and how that can be applied. As to the fee requirement, I think the line of cases beginning with Murdoch versus Pennsylvania, responds to that entirely, that the First Amendment does not permit the government to charge a fee for the exercise of First Amendment rights. You can put a sales tax on newspaper sales, right? As long as it's a everything. As long as it's a generally applicable tax. But this isn't a tax. This is a fee for exercising First Amendment rights on federal property. Also, it's a content-based payment. I mean, of course, it's levied as a fee. Why is that important in terms of the word tax versus fee? So what? Well, because in the cases that the government cites, like Atlanta Constitution, Journal of Constitution versus the Atlanta Airport, we're talking about, again, occupation of a space from which to sell newspapers. And that is a rental fee, the government operating in this proprietary capacity. Here, the government is operating a park where it allows everyone to come in and spend time in the park. And it simply charges some users who exercise their First Amendment rights where it doesn't charge others. This isn't a single-in-kind fee that applies to everybody. Certain speakers are singled out and charge a particular fee. Now, Mr. Busis says that... No, it doesn't apply to everybody. It applies to a category called commercial activity. Well, that's why it applies to a category of people who are called commercial filmmakers, but not all commercial. No, it's all commercial activity. It's not just filmmakers. Except it exempts news uses, which is also a category of commercial filmers, which the government recognizes. Right. Now, so what do you do with the point made by the government and their brief that there are innumerable statutes that exempt news functions for long-established, good, and sufficient reason? There are certain benefits that have been authorized because the government or the government has recognized for a long time that there's a difference between a subsidy and a tax. Subsidizing a First Amendment activity is permitted, as in Reagan versus taxation with representation, or the government is not required to subsidize First Amendment activity in that case. So isn't the exception for news something like a subsidy for news gathering? Well, the difference is you can't go to jail or have to pay a fine if you in the case of a subsidy. But here, if you don't go along with the government scheme that separates speakers from others, you stand the risk of being imprisoned, as Mr. Price was facing down. But the statutes that the government cited are by and large exemptions, just like this one, where some burden is not made applicable to news gathering. Right. But as Mr. Buse was discussing in his appearance a few minutes ago, he cited cases like Leathers versus Medlock, which placed a tax sum on cable television and not on newspapers. He mentions Arkansas Writers Project, but that's the more applicable case where you have a different tax based on the type of magazine you're talking about. Some magazines being charged tax and others not. The Supreme Court said that that was unconstitutional. Here, you have irrational distinctions between current news and documentaries. Some are charged a fee, others not. And the regulations that were adopted pursuant to the law expressly show favoritism towards some kinds of speech. For example, in section 10905A2, it provides that the secretary may include other factors in determining the appropriate fee as the secretary considers necessary. Now, in the legislative history, it was explained that the bill authorizes the secretary to reduce fees if the activity provides clear educational benefits for the department and would exempt from any fees newsreels, television news productions, and some commercial photography. The guidelines that have been adopted pursuant to the statute and the legislative history have expressly favored some content over the others, as we explained at page 26 of our brief, that the superintendent has reduced or waived fees for projects that the National Park Service considers benefits NPS based on the amount of value that NPS receives. It says that they may receive significant benefits from production considered to be human interest or travelogue segments filmed in parks. The benefits can include educational information on park programs, public awareness, and park specific programs or constituency building. So, the level of discretion is built into the fee structure from the statute and through the regulations. And the Supreme Court in Forsyth County versus the Nationalist Movement said that level of discretion in setting fees is sufficient to render the law unconstitutional on its face. And that's precisely what we have here. We have now with the interim regulations, which eliminates both the fee requirement and the permit requirement for impact filming, recognition of how that doesn't really serve any government interest whatsoever. You're citing that for that proposition, right? I mean, this interim regulation doesn't really help you in your argument, right? Because the statute still exists, correct? We still have the statute. I mean, the statute, I mean, I guess you can make a pretty good argument that the interim regulations violate the statute, don't you think? Statute doesn't authorize an exemption like this. No, no statute does not authorize this. You're citing this for their statement that you're citing this for their statement that low impact productions are unlikely, right, to need a permit because they're no more impactful than anything else like that. That's why you're citing it just for that sentence. Well, there's no... Yes, specifically to your question, but there is no greater impact based on the commercial versus non-commercial distinction. And in setting the fee and making the commercial versus non-commercial distinction, both the statute as it exists and the regulations adopted by the park service have discriminated between different speakers and its content-based distinction and the level of discretion all make that unconstitutional. Also, in an overbreadth case, I'm not sure why we have one here since you conceded that your argument applies to the entire park, basically. I'm not sure why we don't have an as-applied challenge, but putting that aside or maybe you can address it. In an overbreadth case, the district court's supposed to determine whether there's a substantial overbreadth. And what do we know? What is there in the record to inform that judgment? Well, I think that the record here stands very much the way it did in Bordley versus the United States. And then Bordley said that it wasn't necessary to look at all of National Park property on all of public forums. And footnote three says that public forums, that traditional public forums may exist in parks, but there isn't a record to say which ones exist. What we know from Bordley is that these regulations are overly broad because they do apply in both traditional and designated public forums, wherever they may be in National Parks. And that makes it overbroad. And it's also overbroad because of the filmers that it applies to, even the low-impact filmers that present no conceivable threat to public property. The degree of commercial filming, which is the subject to this regulation, is essentially minuscule. Several times a year, somebody comes in to film commercially and maybe seek a permit, maybe they don't. If that's the case, and we don't seem to know, then we ought not to be invalidating the statute in its entirety. Well, I think this is addressed in the legislative history to Public Law 106-206, the 2000 enactment that enacted fees where it talked about something of the magnitude of applications that have been submitted over the years. Well, I won't give you my extended reasons for not caring about legislative history, but I don't. It may have been in there as a compromise because they couldn't get it enacted. Who knows? But it does, just as a factual matter, address the extent of filming activities on public lands, and indicates the reason for the enactment. And what it comes down to, essentially, is that Congress wanted a piece of the action. There's no indication that this was necessary to protect public lands, and we know from the interim regulations that it really isn't, and that it's an overbroad way of doing it. But they saw Hollywood productions like Dances with Wolves, and said, we should be able to collect on some of the proceeds. That legislative judgment- Well, by the way you've just stated, that seems eminently reasonable. Well, it may be for the larger productions, but for the now range of people who come to the park, many of whom simply use handheld devices, and some of whom may post on YouTube, then it's staggeringly overbroad because you're talking about thousands upon thousands of park visitors who impose no potential adverse impact on the land, who are nonetheless facing the possibility of prosecution and being fined, simply because they pulled out their smartphone, and they have a YouTube channel. They're not doing anything, those people, by and large, not doing anything with a commercial intent, correct? They may or may not, and Mr. There are millions, I don't know how many millions of visitors to the parks. Acadia National Park, with which I'm familiar, has about three or four million visitors a year, and it's, I think, the smallest park. In any event, the percentage of people filming there for some commercial purposes is inevitably tiny. In which case, the potential impact on the park doesn't justify putting people in jail. Isn't your point that this would be unconstitutional if there was just one person? Well, that's right. I mean, if the law imposes an unconstitutional burden on a person who is engaging in... But the Supreme Court cases always talk about a substantial overbreadth, not one person. But the substantial overbreadth here applies both in terms of the scope of regulations on all areas within the parks. And by the way, let me just say one thing about that. It isn't restricted to just public forum areas. Section 109.05c talks about still photography, and it says people are free to take pictures wherever the public is allowed access in the parks. And they only require permits if there are going to be props or models being used. And that was a part of the law that was undisturbed. But it basically says that people have a right to take photographs wherever they go in the parks. It isn't just the public forum areas. Where does it say that? This is section 109.05c, which basically says that except as provided in paragraph two, the secretary shall not require permit or access fee for still photography in a system unit if the photography takes place where members of the public are generally allowed. Again, it's not focused on just public forum areas or designated public forum areas. It says people simply have the ability to take photos for either commercial or non-commercial purposes whenever they are in places where people are allowed to go. And the amicus brief, the national press... But this case is about filming, not about photographing. Well, yes, it is. And this provision C was expressly excluded by the district court. But it indicates that the interests that the government is talking about aren't affected by whether or not something is commercial or non-commercial. Commercial still photography is permitted. Commercial filming is not. And it's irrational, as discussed in the amicus brief, the National Press Photographers Association, page 22, where they say that the difference between a film and a still photography is irrelevant with today's equipment, where you simply flip a button. At one moment, you're violating the law. At the other moment, you're not. And yet the government is claiming that there's some vital interest that requires making people into federal criminals if they press one button but not another. The law is staggeringly overbroad in its reach in restricting what areas require a permit. And it imposes an unconstitutional tax as in violation of longstanding Supreme Court precedent, like Murdoch versus Pennsylvania. Yeah. All right. If there are no more questions, then Mr. Busev, we'll give you two minutes. Thank you, Your Honor. I have several important points to make. First, there was a lot of focus on the internal guidance. And I want to make very clear that the language that my friend on the other side has focused on in that guidance, where it says that, you know, that smaller, low-impact filming activities are unlikely to need a permit. I want to make very clear, this is not NPS saying that there is no risk and that we don't need permits for small filming activities. This is all downstream of the price decision. This entire memo from page one says that it's dealing with the price decision. It's trying to craft interim guidance that will comply with the price decision. And, you know, it is still the case that Congress has created a risk-adverse, sorry, a risk-minimizing regulatory framework here for NPS, that NPS is entitled to at least require commercial filmers to come to us and say what they're going to do, because they don't know that what they're going to do is going to have a big impact or not, depending on specific conditions and their specific proposed activities. And that's the necessity for a permit requirement, even for small groups. My friend on the other side said that, you know, filming is actually different from other commercial activities we regulate, and that's just really not true. I mean, we regulate commercial tour operators who don't physically occupy the space for, they don't rent it in the same way, but they certainly use NPS land in the same way that a commercial filmer does. Ditto with a small-time hot dog vendor carrying a sack of hot dogs rather than setting up a kiosk. I mean, all of these things are commercial activities we're entitled to regulate. It has nothing to do with permanently occupying federal land or not. Finally, as for, you know, there's been a lot of discussion about small-time filming activities. And what's important to focus on here is that Mr. Price's filming activities involve four people, two observers, a tripod, a mic, and physically occupying federal land for an extended period of time. That's different in kind from a normal park visit. It is not incidental to most filming. And, you know, the hypothetical application to a single person commercially filming on a public forum is so far afield that it does not warrant the harsh medicine of facial overbreath here. Thank you, Your Honor. Yes, I'm sorry. So you objected to the nationwide injunction? Yes, Your Honor. Yeah. But in a case like this, where the standing of the plaintiff is based upon the effect of the regulations on people other than the plaintiff himself, how can that possibly be limited to the relief that you would give in an as-applied case? Because in every circumstance, the Article III power extends only to granting as much relief as is necessary to give full relief to the plaintiff, but not to non-parties. That's just a fundamental... You're saying that the overbreath doctrine of the Supreme Court, which is, of course, is of its own making, it's not to be found in Article III, is unconstitutional. No, Your Honor, we're absolutely not saying that. We're saying that the overbreath rule is a merits rule, just like all facial review is a rule for determining whether the plaintiff in their own case and controversy has prevailed on the merits. But no one thinks... I'm sorry, Your Honor. Can you cite one case? You cite a bunch of cases here on the preliminary injunction thing, but none of them are First Amendment facial cases, facial challenges under the First Amendment. I don't know of any case that has held that if a statute is unconstitutional, the court limits its injunction to the plaintiff who brought the case. Do you know of a case like that? I'm sorry, Your Honor, I think I would have to flip it the other way around and say, I'm actually not aware of a case from this Court of Supreme Court saying... No, why don't you start by answering my question? I'm sorry, Your Honor, so just to be clear, I don't know of a case that's barely addressed. Do you know of a case where the court invalidates a statute on First Amendment grounds and limits the relief to the plaintiff who brought the case? That's all, that's my question. I don't think I'm aware of a case from this Court of Supreme Court holding that after having addressed the issue as being teed up by the litigants, Your Honor. But to be clear, I'm actually not aware of a case, I realize I'm over time, just one final point on this. I'm not aware of a case in which this Court of the Supreme Court has held that because you prevail on a facial challenge, you therefore get a nationwide injunction protecting non-parties to the case. That's antithetical to the court. Doesn't the court just declare the law unconstitutional? You can conclude that... Isn't that declaratory judgment that the law is unconstitutional is the equivalent of an injunction? We have often treated a declaratory judgment as the equivalent of an injunction. That's correct, Your Honor. But all I think technically the declaratory judgment does is ensure that the specific litigant wouldn't have to litigate the merits of that issue again.  Okay. Thank you, Your Honor. All right, gentlemen, your case is submitted. And Madam Clerk, if you'd call the next case.
judges: Henderson, Tatel, Ginsburg